In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-4018

NANCY R. LAMON,

*Petitioner-Appellant,*

*v.*

ANA M. BOATWRIGHT,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04-C-873—**Rudolph T. Randa**, *Chief Judge.*

---

ARGUED SEPTEMBER 22, 2006—DECIDED NOVEMBER 8, 2006

---

Before POSNER, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Three years ago, in a 4-3 decision on direct review, the Wisconsin Supreme Court rejected Nancy Lamon's claim that the state violated the rule announced in *Batson v. Kentucky* when it exercised a peremptory challenge against the only black member of the venire summoned to sit as potential jurors at her trial on a state charge of armed robbery. Before the supreme court turned her down, the same claim was rejected by both the state trial judge in Rock County, Wisconsin, and the Wisconsin Court of Appeals. Accordingly, Lamon's claim has been rejected, and her robbery conviction affirmed, by all three levels of the Wisconsin judicial system.

Having exhausted her state remedies, Lamon moved to federal court where her petition for habeas corpus met with a similar lack of success. Chief Judge Rudolph T. Randa of the United States District Court for the Eastern District of Wisconsin rejected her claim in 2005. Lamon now appeals that decision to us, but given the present posture of the case—a collateral review subject to the stringent limitations of AEDPA where we are not free to simply pick sides between the Wisconsin Supreme Court majority and dissenting opinions—we conclude that her losing streak must continue.

The facts of Ms. Lamon's case are simple, and not really important to the issue she presents to us. But to put the case in perspective, here is what it was all about: Lehman Jones (who like Lamon is an African-American) was driving home one night when Lamon flagged him down and asked to be taken to a telephone; while together in the car, and with Lamon pointing an object at his side that he thought was a gun, Jones surrendered his wallet; Lamon then left the car and retreated to a car being driven by an accomplice. Armed robbery charges against her (as a repeat offender) were issued a few days later.

During the jury selection process, the prosecutor exercised a peremptory strike against Dondre Bell, a resident of Beloit, Wisconsin, without questioning him individually. Lamon challenged the strike under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the judge held a hearing in chambers. The judge assumed Lamon had established a prima facie case of discrimination because Bell was the only black member of the venire. Accordingly, the judge asked the prosecutor to explain her strike.

The prosecutor responded that she doubted Bell's veracity. She explained that her office prosecuted many Beloit residents named Bell and that a computer check the previous day revealed numerous police contacts at Bell's

address, including one in which a "Mrs. Bell" reported that her husband had stolen her car to support his drug habit. And, the prosecutor continued, Bell did not respond affirmatively when she asked if any relative or close friend had been convicted of a crime or been a victim of crime. This, she said, caused her to doubt Bell's credibility. Her suspicions increased, she explained, because Bell simply wrote "varies" on a questionnaire form that asked him to detail his employment over the past 5 years.

Lamon responded that "Bell" is a common name and that it was unknown how long Dondre Bell was living at his current address. It followed, Lamon insisted, that the prosecutor should have individually questioned Bell about her concerns before striking him. Lamon then asked the judge to individually question Bell before ruling on her *Batson* objection. The judge asked the prosecutor why she had not questioned Bell, and she iterated her concern that Bell would not have been forthright and also stated that she did not want to "single him out." The judge declined to question Bell and concluded, "Well, I think the State has made its case and it does have just cause for the strike."

After Lamon was convicted, as we said, her appellate claims (including several besides her *Batson* argument) were denied, first by the trial court, next by the Wisconsin Court of Appeals, *State v. Lamon*, 646 N.W.2d 854 (Wis. Ct. App. 2002) (per curiam), and finally by the Wisconsin Supreme Court. *State v. Lamon*, 664 N.W.2d 607 (Wis. 2003).

The Wisconsin Supreme Court rejected Lamon's contention that the trial judge was not in a position to adequately assess the prosecutor's credibility since she had not questioned Bell individually before exercising her strike and the judge was unwilling to question Bell himself before ruling on the issue. The court correctly explained that *Batson*

outlines a three-step process for determining if a peremptory strike violates the Equal Protection Clause: (1) the defendant must establish a prima facie case that the strike was racially motivated, (2) the burden then shifts to the prosecutor to come forward with a race-neutral reason for the strike, and (3) the trial judge must assess the credibility of the explanation and determine whether purposeful discrimination has been established. *Id.* at 615-16 (citing *Batson*, 476 U.S. at 96-98). Applying this test to Lamon's case, the court concluded that the trial judge's ruling, although quite skimpy, sufficiently showed that he assessed the prosecutor's credibility and not merely, as the dissent contended, whether the prosecutor's explanation was race-neutral. *Id.* at 624; *see id.* at 639-40 (Bradley, J., dissenting). The court held that more elaborate findings were not required. *Id.* at 624 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003) (hereafter *Miller-El I*) ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it.")). The court then held that the trial judge's finding of no discriminatory intent was not clearly erroneous. As the court explained, it is *counsel's* credibility that the trial judge must assess, and while it might have been helpful for the judge to have heard Bell's responses to questioning by the prosecutor before the strike was exercised, under the totality of the circumstances, that was not necessary. *Id.* at 620-21 (citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). The court reasoned that the entire record, including the results of the computer check and Bell's answer to the employment history question on the questionnaire, supported the trial judge's decision to credit the prosecutor's facially nondiscriminatory reasons for exercising the strike as she did. *Id.* at 627-28.

Three justices dissented in two opinions. All three joined in parts I and II of Chief Justice Shirley S. Abramson's dissent, which argued that the trial judge failed to fulfill his

duty, under *Batson*'s third step, to assess the credibility of the prosecutor's explanation and to include detailed findings in the ruling itself. *Id.* at 628-35 (Abrahamson, C.J., dissenting); *id.* at 39-40 (Bradley, J., dissenting). Going further than the other two dissenters, the chief justice also argued that generating a police report on Bell's address was itself evidence of discrimination, and that the trial judge had a duty to inquire, sua sponte, whether the prosecutor conducted similar background investigations on white members of the venire. *Id.* at 635-39. The court itself answered this last point by noting that the burden of persuasion lay with Lamon, who did not pursue this inquiry at the *Batson* hearing. (*Id.* at 628 n.13.) (At oral argument before us, Lamon conceded that the trial court had no such duty.)

In this appeal, Lamon argues that: (1) it is impossible to discern from the trial judge's brief ruling whether he ever evaluated the prosecutor's credibility—and the truthfulness of her explanation for her strike—as required under *Batson*'s third step, (2) even if the trial judge made a determination as to the prosecutor's credibility, his conclusion should be disregarded because he ruled without questioning Bell individually, and (3) the trial judge erred in his factual finding that the strike was not discriminatory. To prevail on these arguments, Lamon bears a heavy burden. She must show that the adjudication of her claim by the Wisconsin Supreme Court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2); *see also Rice v. Collins*, 126 S. Ct. 969, 974 (2006). In other words, she must establish not only that the court was wrong, but that it applied Supreme Court precedent in an "objectively

unreasonable manner," *Brown v. Payton*, 544 U.S. 133, 141 (2005), that fell "well outside the boundaries of permissible differences of opinion." *See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). Although Lamon directly attacks the trial judge's *Batson* ruling, we evaluate the decision of the last state court to rule on the merits of a prisoner's claim, *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006), here the opinion of the Wisconsin Supreme Court. As a result, Lamon can prevail only if the Wisconsin Supreme Court unreasonably applied precedent from the Supreme Court of the United States in upholding the trial judge's decision.

We start with the trial judge's ruling. Lamon argues, echoing the dissenters, that the Wisconsin Supreme Court erred because, in her view, the trial judge's terse ruling casts doubt on whether he ever assessed the credibility of the prosecutor and her explanation as *Batson*'s third step requires. But we can infer from the record that the trial judge engaged in the step-three inquiry: the court observed the prosecutor give her explanation, asked her several follow-up questions that were aimed at testing her credibility, allowed Lamon the opportunity to respond, and then ruled. Although it is certainly good practice to explain why a proffered explanation has been found credible, we cannot conclude that the Wisconsin Supreme Court unreasonably applied clearly established Supreme Court precedent in declining to require anything further of the trial judge in this case. In fact, the court expressly noted the Supreme Court's pronouncement that "a state court need not make detailed findings addressing all the evidence before it" so long as the relevant inquiry is undertaken. *Lamon*, 664 N.W.2d at 780-81, (citing *Miller-El I*, 537 U.S. at 347).

Next we consider the process engaged in by the trial judge in deciding to credit the prosecutor's reasons for striking Bell from the jury pool. Lamon argues that she was denied a complete *Batson* hearing because the judge did not

personally question Bell. She asserts that the judge failed to follow the mandate set forth in *Miller-El v. Dretke*, 125 S. Ct. 2317, 2325 (2005) (hereafter *Miller-El II*), which instructs trial judges to consider "all relevant circumstances" at the third step of the *Batson* analysis.

Although we agree that a trial judge must analyze the relevant evidence before determining if a prosecutor's race-neutral explanation is credible, *see Coulter v. Gilmore*, 155 F.3d 912, 921 (7th Cir. 1998), Lamon incorrectly assumes that Bell's responses to questions posed by the judge after the strike would have proven relevant to the inquiry. Lamon's attorney explained that he "questioned the factual accuracy of [the prosecutor's] reasons" and "wanted to use [Bell's] answers to prove his point," but he aims at the wrong target. The relevant question during the third step of the *Batson* inquiry is whether a strike was racially motivated. *Hernandez v. New York*, 500 U.S. 352, 365 (1991); *Williams v. Chrans*, 957 F.2d 487, 491 (7th Cir. 1992). It follows that *Batson* and its progeny direct trial judges to assess the *honesty*—not the accuracy—of a proffered race-neutral explanation. *See Purkett v. Elm*, 514 U.S. 765, 789 (1995) (per curiam) (admonishing lower court for focusing on the "*reasonableness* of the asserted nonracial motive . . . rather than the *genuineness* of the motive" (emphasis in original)); *United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004) (explaining that under *Batson* "the government's proffered reason for the strike need not be particularly persuasive, or even based on quantifiable data, so long as it is not pretextual"); *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000) ("[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based.").

Reflecting the limited nature of the inquiry, the procedures required in assessing counsel's motive are limited as

well. In *Batson* the Court expressly declined to mandate "particular procedures." *Batson*, 476 U.S. at 99. Since then the Court has explained that observing the "demeanor of the attorney" will often provide the "best evidence" of purposeful discrimination. *See Hernandez*, 500 U.S. at 365. In that vein, there certainly does not exist any "clearly established" Supreme Court precedent suggesting that a party has the right to call stricken panelists as witnesses and question them during a *Batson* hearing. Rather, we have held that *Batson* does not require the use of evidentiary proceedings which would be unlikely to produce evidence bearing on counsel's credibility. *See Williams*, 957 F.2d at 491. In fact, in *Williams* we affirmed the denial of the defendant's request to question a stricken panelist—the same request that Lamon made—because it "would not have been probative of whether . . . the prosecution sought to exclude [the panelist] on the basis of race." *Id.*

Here, likewise, Lamon had the opportunity to discredit the prosecutor, and questioning Bell would not have further divulged whether the prosecutor sincerely doubted his veracity. After all, the prosecutor's concerns were based on Bell's silence. And even if questioning Bell revealed that he was unrelated to the Bell family that the prosecutor had in mind, that fact would not have shed light on whether the prosecutor *honestly believed* that Dondre Bell was a member of that family. As we said, the law is clear that it is the honesty of the prosecutor's explanation—and that alone—which a trial judge must assess at the third step of the *Batson* analysis. Accordingly, we cannot say that the Wisconsin Supreme Court unreasonably applied federal law when it held that the trial judge conducted an adequate, although minimal and not a model to be followed, step-three inquiry into Lamon's *Batson* claim.

Lastly, we consider whether the trial court erred in finding that the strike was not discriminatory. Citing

*Miller-El II*, Lamon contends that the prosecutor's failure to individually question Bell is itself evidence of discrimination. But on collateral review, state-court factual findings are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Rice*, 126 S. Ct. at 974. Lamon has not met this burden. This case is nothing like *Miller-El II* where a side-by-side comparison of the voir dire testimony revealed that the prosecutor's reasons for striking black panelists applied with equal force to white panelists who were selected as jurors, *Miller-El II*, 125 S. Ct. at 2325-26, leading the Court to conclude that the prosecutor's explanation "reeks of afterthought." *Id.* at 2328. Much to the contrary, the check run on Bell's address along with the vague answer given to the prior employment question rendered credible to the trial judge the prosecutor's honest, even if possibly mistaken, belief that Bell would not have answered additional questions honestly.

Accordingly, we AFFIRM the district court's denial of Lamon's petition for a writ of habeas corpus.

ROVNER, *Circuit Judge*, dissenting. The majority "cannot say that the Wisconsin Supreme Court unreasonably applied federal law when it held that the trial judge conducted an adequate, although minimal and not a model to be followed, step-three inquiry into Lamon's *Batson* claim." *Supra*, at 8-9. But on this record, there is no indication that the trial court ever engaged in *any* step-three analysis under *Batson*. Because the trial court engaged in no step-three analysis, I believe that the Wisconsin Supreme Court unreasonably applied federal law and I therefore respectfully dissent.

The trial court said precious little on the *Batson* issue, so little that it is worth repeating. As the parties began to strike jurors, defense counsel asked to be heard in chambers. The court began the hearing by asking defense counsel, "What's the problem?" Tr. at 24. Counsel then lodged his *Batson* challenge. Addressing the prosecutor, the court verified that the juror in question was the only black juror on the panel. Tr. at 25. The court then stated, "And as I recall you did not even ask him any individual questions. Do you have some reason for the strike?" Tr. at 25. The prosecutor offered her reasons, citing among other things, the report on police contacts at the juror's address. The court asked the clerk to mark the report as an exhibit. Tr. at 25-26. After the prosecutor offered an additional reason for the strike, the court solicited a response from defense counsel. Lamon's lawyer noted that the stricken juror had a common last name, and that the prosecutor could have questioned him individually if she truly was concerned that he was a member of the family listed in the police report. Tr. at 25-28. The prosecutor then noted her concern that the juror "was not responding to the questions on voir dire and was not being completely forthright and honest." Tr. at 28. The court asked, "Specifically what questions are you referring to, counsel?" Tr. at 28. The prosecutor noted that juror Bell failed to raise his hand in response to her ques-

tion regarding whether any relatives or close friends had been a victim of a crime. Tr. at 29. Defense counsel again noted that the prosecutor could have questioned juror Bell about her concerns but did not. Counsel then asked the court to *voir dire* juror Bell before allowing the strike. Tr. at 29. The court then asked the prosecutor, "Any particular reason, Mrs. Bollendorf, why you didn't make specific inquiry as to the juror as to some of these matters?" Tr. at 29. She replied that she did not think the juror would be any more forthcoming when questioned individually and that she did not wish to appear to be singling him out. The court then ruled, "Well, I think the State has made its case and it does have just cause for the strike." Tr. at 29-30.

To sum up the trial court's entire *Batson* analysis:

Step one: "What's the problem?" "[T]he only black juror is the one in question."

Step two: "Do you have some reason for the strike?" "Any particular reason . . . why you didn't make specific inquiry as to the juror as to some of these matters?" "Well, I think the State has made its case . . . "

Step three: ". . . and it does have just cause for the strike."

At step one, a defendant must make out a *prima facie* case of discriminatory jury selection. *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324 (2005). Given that the State used its first peremptory challenge to strike the sole African-American venireperson, the trial court assumed the *prima facie* case was shown, and the State did not object to that assumption.

At step two, the burden shifts to the prosecution to come forward with a neutral explanation for challenging jurors within an arguably targeted class, in this case, African-American members of the jury pool. After the

prosecutor offered her reasons, the court found that "the State has made its case." *Miller-El*, 545 U.S. at 239, 125 S. Ct. at 2324.

At step three of the analysis, "the trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Miller-El*, 545 U.S. at 239, 125 S. Ct. at 2325. But instead of determining whether the defendant established purposeful discrimination, the court said that the State "does have just cause for the strike." This is not a step-three analysis; it is a statement that indicates ignorance on the part of the trial court regarding its duty at that stage of the proceedings. The burden at this step belongs to the defendant, not the State. And "just cause" is a phrase that courts use when analyzing strikes for cause, not peremptory strikes. Nowhere does the court acknowledge its duty at step three. Nowhere does the court actually indicate that it has determined whether purposeful discrimination has taken place. In other words, there is no step-three analysis at all, and the court's comments indicated only utter confusion about the *Batson* analysis. In the complete absence of any step-three analysis, it was unreasonable for the Wisconsin Supreme Court to find a "minimal and not a model to be followed, step-three inquiry." The analysis was not minimal; it was non-existent. And it was not a model because, if any analysis occurred, it is invisible in the record.

Had the trial court conducted a step-three analysis, it might have noticed, as the Supreme Court did in *Miller-El* that the "State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El*, 545 U.S. at 246, 125 S. Ct. at 2328 (quoting *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000)). The prosecutor's repeated refusal to question juror Bell about her concerns was evidence that her race-neutral reasons for the strike were

a sham. Had the trial court engaged in a step-three analysis, it could have compared juror Bell to the white jurors selected for the panel so that it could determine whether the prosecutor ran criminal background checks on any of them, whether they lived in high crime neighborhoods, and whether they had questionable work histories, all reasons the prosecutor used to strike juror Bell. It is especially ironic that the majority distinguishes *Miller-El* on the grounds that we have no side-by-side comparison of the *voir dire* testimony revealing whether the prosecutor's reasons for striking black panelists applied with equal force to white panelists who were selected as jurors. There is a simple reason we have no such comparison: the trial court engaged in no step-three analysis where such a comparison could be made. It is a patently unreasonable application of federal law to allow the Wisconsin courts to redefine *Batson* as a two-step test.

I therefore respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*