Anthony HOLDER, Petitioner–Appellant,

v.

George C. WELBORN, Respondent–Appellee.

Nos. 92–3891, 94–2143.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1995.

Decided July 25, 1995.

Rita M. Novak, Michael M. Glick (argued), Office of Atty. Gen., Chicago, IL, for George C. Welborn, in No. 94–2143.

Before CUDAHY and COFFEY, Circuit Judges, and WALTER,[1] District Judge.

WALTER, District Judge.

Anthony Holder has appealed the denial of his 28 U.S.C. § 2254 petition for writ of *habeas corpus,* challenging the district court's finding that the prosecutors in Holder's jury trial did not exercise peremptory challenges in violation of the principles established by United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). For the reasons set forth below, we AFFIRM the dismissal of the *habeas corpus* petition.

## I.  BACKGROUND

### A.  *Procedural History*

In 1985, defendant Anthony Holder ("Holder"), a black male, was charged in Will County, Illinois with the murder of Christopher Zouganelis, a white male. Jury selection in Holder's case in the Circuit Court of Will County began on June 5, 1985 with eight blacks originally selected to be on the venire. After completed *voir dire,* three of the black venirepersons were excused for cause and the remaining five were stricken through the prosecutors' use of peremptory challenges. During the prosecutors' exercise of the peremptories, the defense counsel notified the court that the prosecution was excluding all of the blacks from the jury. However, the prosecution did not offer any justification for the exercise of the peremptory challenges, and the court did not order any explanation. Ultimately, an all-white jury was empaneled. At the close of trial, the defendant was convicted of murder and sentenced to natural life imprisonment.

Holder appealed his conviction to the Illinois Appellate Court asserting that the State's use of peremptory challenges to exclude all blacks from the jury violated his

Michael A. Moynihan (argued), Joan M. Dillon, Moynihan & Dillon, Chicago, IL, for Anthony Holder in No. 92–3891.

Michael M. Glick, Office of Atty. Gen., Chicago, IL (argued), for George C. Welborn in No. 92–3891.

Michael A. Moynihan, Moynihan & Dillon, Chicago, IL (argued), for Anthony Holder in No. 94–2143.

1. The Honorable Donald E. Walter of the United States District Court for the Western District of Louisiana, sitting by designation.

Fifth Amendment right to equal protection. *People v. Holder,* 153 Ill.App.3d 884, 106 Ill.Dec. 700, 506 N.E.2d 407 (3d Dist.1987) (hereinafter *"Holder I "*). Holder relied upon *Batson,* decided during the pendency of his appeal, which set forth the requirements for establishing a Fifth Amendment violation through the use of peremptories.[2] The appellate court affirmed the conviction of the trial court, stating that defense counsel waived any right to a *Batson* claim on appeal by failing to "object" to the prosecutors' use of peremptories during the trial or in post-trial motions. *Holder I,* 506 N.E.2d at 408. The court explained that although defense counsel asked that the record reflect the prosecutors' use of peremptories to strike the black venirepersons, his failure to formally object to such behavior constituted a waiver. *Id.* at 886, 106 Ill.Dec. at 701, 506 N.E.2d at 408. Subsequently, the Illinois Supreme Court denied Holder's leave to appeal. *Holder I,* 116 Ill.2d 568, 113 Ill.Dec. 309, 515 N.E.2d 118 (1987), *cert. denied,* 484 U.S. 1074, 108 S.Ct. 1049, 98 L.Ed.2d 1012 (1988).

Holder then filed a petition for post-conviction relief asserting that his counsel's failure to properly object to the discriminatory use of peremptories constituted ineffective assistance of counsel in violation of the Sixth Amendment. The court relied upon the standards set forth in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), in determining whether Holder's counsel should have objected to the state's use of peremptories.[3] According to *Swain,* in order for a defendant to establish a prima facie case of jury discrimination, it was necessary to prove that the prosecutor had consistently excluded blacks from the jury in past jury trials. *Swain,* 380 U.S. at 223, 85 S.Ct. at 837. Because there was a lack of evidence to establish that the prosecutors in Holder's case had maintained a pattern or practice of

striking jurors on the basis of race, the court found that Holder's counsel was not ineffective by failing to object to the prosecutors' use of peremptories, and dismissed Holder's post-conviction petition.

The Illinois Appellate Court affirmed the dismissal of the post-conviction petition agreeing that Holder had failed to prove ineffective assistance of his trial counsel. *People v. Holder,* 213 Ill.App.3d 109, 156 Ill.Dec. 744, 571 N.E.2d 528 (3d Dist.1991) (hereinafter *"Holder II "*). Notably, the appellate court also reviewed the trial record of the *voir dire,* and concluded that there were "plainly apparent" racially neutral reasons for the prosecutor's challenges of the five black venirepersons. *Id.* 156 Ill.Dec. at 746, 571 N.E.2d at 530.

Having exhausted his state court remedies, Holder filed a petition for *habeas corpus* relief pursuant to 28 U.S.C. § 2254 with the United States District Court for the Northern District of Illinois asserting that he was denied a hearing on his jury discrimination claim in violation of *Batson.* The district court denied the *habeas* petition stating that because Holder had waived his right to a *Batson* hearing at trial, he could not assert the claim on *habeas* review. Thereafter, Holder appealed to this court, which remanded the case to the district court for a determination on the merits of the *Batson* claim.

District Judge Charles P. Kocoras found that Holder had established a prima facie case of discrimination under *Batson.* Because a prima facie case was established, Judge Kocoras referred the matter to Magistrate Joan M. Lefkow with instructions to conduct an evidentiary hearing to determine if the prosecutors could demonstrate proper justifications for challenging the black venirepersons.

**2.** Because a direct appeal was pending in Holder's case at the time the *Batson* decision was rendered, the principles in *Batson* are applied retroactively to cover the issues in this case. *See, Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

Basically, the Supreme Court in *Batson* held that the Equal Protection Clause forbids the government from exercising peremptory challenges to remove blacks from the venire based solely upon their race or on the assumption that black

jurors will not be able to be impartial against a black defendant. *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719.

**3.** Because *Batson* was not decided until 1986, the court correctly held Holder's counsel to the standards set forth in *Swain,* which was the law regarding jury discrimination through the use of peremptories at the time of Holder's jury trial in 1985.

During the *Batson* hearing conducted on October 21, 1993, the two prosecutors who had tried the original case against Holder eight years earlier, Randall Miller ("Miller") and Kathleen Patton ("Patton"), testified for the first time as to their reasons for exercising the peremptories upon each of the blacks on the venire. After the hearing, Holder submitted proposed findings of fact and conclusions of law wherein he limited his claim of discrimination to the exclusion of two black jurors, Calvin Quarles and Priscilla Reed. The magistrate issued a report and recommendation stating her opinion that the prosecutors had successfully established a nonracial justification for the exercise of the peremptory upon Mr. Quarles, but that they violated *Batson* by failing to provide a nonracial reason for the exclusion of Ms. Reed.[4] District Judge Lienenweber reviewed the magistrate's report, along with the *voir dire* transcript and the transcript of the *Batson* hearing, and made a determination that the prosecutors had expressed race-neutral justifications for the exclusion of both Mr. Quarles and Ms. Reed. Finding no *Batson* violation, the court denied Holder's petition for *habeas*. Thereafter, Holder filed a timely Notice of Appeal on May 12, 1994 with this court seeking a reversal of the district judge's determination that there was not an improper basis for the prosecutors' peremptory challenge against Ms. Reed.[5]

## B. *Magistrate's Findings*

Prosecutors Patton and Miller, relying upon the aid of the *voir dire* transcript and their contemporaneously-taken notes, testified at the *Batson* hearing as to their justification for exercising a peremptory challenge to excuse Ms. Reed from the venire. Both Patton and Miller stated that their notes did not reflect the race of any venireperson. Patton recalled that in 1983, Ms. Reed's brother was shot and killed by his wife, but

that the Will County State's Attorney's Office dropped the charges against the shooter. Patton stated that she believed this incident was vital to Ms. Reed's ability to serve as a juror in Holder's trial because the murder had occurred just two years prior to the trial, was a serious crime against a close relative, and involved the Will County State's Attorney's office. Patton expressed her concern that "there was a good chance that there would be some animosity towards the State's Attorney's Office."[6]

Miller's notes also reflected that Ms. Reed's brother was the victim of a shooting by his wife in Will County. He stated that because it was a Will County shooting, he "felt there may be some animosity towards the prosecutor's office because no one was prosecuted for the shooting of her brother."[7] His notes included the phrases "seems OK" and "no hard feelings against the State's Attorney's office."[8] Miller explained that "the way the notes are written in the order they're written, it seems when she answered the question whether she had any hard feelings against the State's Attorney's office, I was not satisfied with … my visceral reaction to that answer."[9] On cross examination of Miller, he explained his skepticism as follows:

> Q. You also testified that you were concerned that Ms. Reed might harbor ill feelings against the Will County prosecutor's office because your office dismissed charges against the alleged killer of her brother.
>
> A. That was a concern of mine, yes. I would point out that I recall Ms. Reed was a black woman, and I'd assumed her brother was black. And the victim in the instant case, the Holder shooting, was white. So it was a concern of mine that maybe Ms. Reed would harbor some feelings of

---

4. After the magistrate issued the report and recommendation, Judge Kocoras recused himself pursuant to 28 U.S.C. § 455(a) and the case was reassigned to Judge Harry D. Leinenweber.

5. Because Holder does not appeal the determination that Mr. Quarles was properly excused, we will limit our inquiry to the decision regarding Ms. Reed.

6. Transcript of *Batson* hearing conducted on October 21, 1993 at page 20.

7. *Id.* at 46.

8. *Id.*

9. *Id.* at 47.

selective prosecution, and it was a real concern in that case.

Q. Since she was black?

A. That's correct.

Q. And that she wouldn't be able to discharge her duties effectively because of her race?

A. No. That would not have been a concern, not her race. Only as it related to her brother being shot and killed in Will County, the charges being dropped, and then the victim in the instant case being white and the defendant being black. In that specific area, then her race was relevant.[10]

Magistrate Lefkow believed these reasons given for excusing Ms. Reed constituted a mere pretext for discrimination. She stated, "the record lacks any indication in anything Ms. Reed said or failed to say which would indicate that this concern was well founded." [11]

Magistrate Lefkow based her opinion mainly on a comparison between Margo Ellman, a white female selected to serve on the jury, and Ms. Reed. Juror Ellman's ex-husband had been indicted for mail fraud and her son had been prosecuted for grand larceny by the Will County State's Attorney's Office. The case against her son was within two years of the Holder trial and resulted in his serving two years probation. Ms. Ellman responded in *voir dire* that she felt her son and her ex-husband were treated fairly by the court and the prosecution and that she could be a fair juror in the Holder trial. Magistrate Lefkow expressed that these incidents Juror Ellman had with the law were similar to those of Ms. Reed, yet the prosecutors accepted Juror Ellman's statement that she could be fair and rejected Ms. Reed's same assurance. From the prosecutors' disparate treatment of the potential jurors, the magistrate drew the inference that the State must have believed "that Ms. Reed as a black individual could not be trusted to be fair in the trial of a black defendant." [12]

Finally, Magistrate Lefkow noted that although the prosecution expressed great concern with Ms. Reed's incident with the law, they had a seeming lack of interest in the brushes with the law of several of the empaneled jurors. She cited as examples:

1) Juror Patricia Reimer who had been sued by a municipality for running ice cream trucks out of her home;

2) Juror Mary Pelton, whose brother had been arrested for shooting his gun in his yard six years prior to trial; and

3) Juror Glen Meadows who had been arrested fifteen months before the Holder trial in Will County.

Because the prosecution did not ask the same detailed questions of these jurors regarding their brushes with the law as were asked of Ms. Reed, Magistrate Lefkow concluded that the prosecutors' stated concern about Ms. Reed's experience was merely a pretext. Accordingly, Magistrate Lefkow issued a report and recommendation on November 24, 1993 concluding that Priscilla Reed was excluded from the jury because of her race.

C. *District Court's Findings*

Judge Leinenweber made a *de novo* finding that the prosecution's explanation for exercising a peremptory to excuse Ms. Reed from the venire was "clear and specific and set forth legitimate reasons for the actions and was not a pretense for discrimination." [13] The district court explained that the jurors listed by the magistrate as having brushes with the law could not be placed on the same level as Ms. Reed whose brush with the law was particularly significant. The court also believed that the prosecution had a legitimate concern that Ms. Reed may have animosity toward the government because of possible "selective prosecution," explaining:

[i]t was of particularly [sic] significance that the killer of Reed's brother was not prosecuted, while the government in this case was not only prosecuting Holder for

**10.** *Id.* at 54.

**11.** Report and Recommendation of Magistrate Lefkow dated November 24, 1993 at page 26.

**12.** *Id.* at 27.

**13.** Judge Leinenweber's Memorandum Opinion and Order dated April 12, 1994 at page 5.

murder of a white person but was seeking the death penalty.[14]

The court further noted that the fact that race was considered by Miller in making his decision to strike Ms. Reed did not create a per se *Batson* violation. Instead, *Batson* only forbids an attorney from exercising a peremptory against a black venireperson on the belief that the potential juror would be biased in favor of a black defendant, which was not Miller's concern.

The court reasoned that because the magistrate was not able to view Ms. Reed's actions at the *voir dire*, she had no basis for her assertion that the record was void of any statements or actions of Ms. Reed that would support the prosecutors' concern. The court noted, that the prosecutors, on the other hand, were in such a position to view Ms. Reed as she gave her verbal answers and were entitled to rely upon the intuition which resulted from their first hand observance.

Finally, the court expressed its concern with applying *Batson* retroactively, stating:

[i]n this case, the prosecutors were required to explain to the court actions taken over 8 years ago at a time the law did not require their actions be justified. The court is impressed by the way the prosecutors were able to articulate lucidly neutral explanations for acting the way they did and that their notes were consistent with the explanations they gave.[15]

## II. DISCUSSION

### A. *Standard of Review*

■ Ordinarily, a reviewing court gives deference to the findings of a district court regarding whether a *Batson* violation occurred, and will reverse only those findings that are clearly erroneous. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Such deference is accorded because under current *Batson* procedures, the trial court generally conducts the *Batson* inquiry contemporaneously with the *voir dire* procedure, and therefore is in the best position to witness the statements of the challenged jurors and

to assess the credibility of the prosecutors as they seek to justify the exercise of a peremptory challenge. *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). However, this rationale given by the Supreme Court for the use of the clearly erroneous standard is inapplicable to the circumstances in this case, where a magistrate conducted the *Batson* hearing more than eight years subsequent to the *voir dire* proceeding. Neither Magistrate Lefkow nor Judge Leinenweber were present at the *voir dire* proceeding, and therefore did not have the opportunity to observe the demeanor of the members of the venire as they answered the questions posed by the attorneys. Moreover, although Magistrate Lefkow was able to hear the explanations given by the prosecutors at the *Batson* hearing, she was not in the same position to make credibility determinations as is a trial judge who has the opportunity to observe the responses from the venire and to hear the attorney's explanation for a peremptory immediately after it is exercised. In fact, the prosecutors admitted that at the time of the *Batson* hearing, they had little, if any, recollection of the actual *voir dire*, and found it necessary to testify with aid from the *voir dire* transcript and from their contemporaneously taken notes. Therefore, since Magistrate Lefkow, Judge Leinenweber, and the members of this panel all have basically been provided with only a cold record from which to determine if a *Batson* violation occurred at Holder's jury trial, we find that no deference is warranted under these circumstances. Accordingly, we will conduct a *de novo* review of the record before us.

### B. *Batson Analysis*

The Supreme Court in *Batson* set forth an evidentiary framework for assessing whether the exercise of peremptory challenges violates the Fifth Amendment right to equal protection. According to this framework, a defendant can establish a prima facie case of purposeful discrimination by showing: (1) that he was a member of a cognizable racial group; (2) that the prosecutor exercised per-

---

**14.** *Id.*

**15.** *Id.* at 7–8.

emptory challenges to remove persons of the defendant's race from the venire; and (3) that there were sufficient facts and circumstances to raise an inference that the prosecution utilized the peremptories to exclude members from the venire on the basis of race. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. Once these three elements are satisfied, the burden shifts to the government to articulate race-neutral justifications for striking the black venirepersons. *Id.* at 94, 106 S.Ct. at 1722. The explanation offered need not rise to the level of a challenge for cause. *Id.* at 97, 106 S.Ct. at 1723. The government must, however, set forth legitimate reasons for the challenges that are "clear and reasonably specific" and "related to the particular case to be tried." *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20. If the government is successful in carrying its burden, then the trial court will have to determine if the defendant has established purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724.

■ On appeal, the parties do not dispute that the defendant established a prima facie case of discrimination. Instead, the appellant argues that the prosecution did not articulate a race-neutral justification for striking Ms. Reed. After conducting a *de novo* review of the record as a whole, including the transcripts of the *voir dire* and the *Batson* hearing, Magistrate Lefkow's report and recommendation, and Judge Leinenweber's opinion below, we agree that the prosecution's justification for the exercise of its peremptory challenge against Ms. Reed was legitimate and was sufficient under *Batson* to rebut the defendant's prima facie case.

A careful examination of the Supreme Court's opinion in *Batson* reveals exactly which justifications for exercising peremptories upon black venirepersons are prohibited by the commands of the Equal Protection Clause. The Supreme Court explained:

> the Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely* on account of their race or on the assumption that black jurors as a group

will be unable impartially to consider the State's case against a black defendant.

*Id.* at 89, 106 S.Ct. at 1719. (emphasis ours).

Ms. Reed was stricken from the venire because of the prosecutors' concern that a personal incident occurring just two years prior to the *Holder* trial, might cause her to have animosity towards the Will County State's Attorney's Office. Prosecutor Miller testified at the *Batson* hearing that Ms. Reed's race was a factor only in so far as it related to the issue of selective prosecution; specifically, that her brother was black and was murdered in Will County, with the prosecution dropping the charges against the black suspect, and that the victim in the *Holder* case was white, with the prosecution seeking the death penalty against the black suspect. We agree with the district court that "such a juxtaposition was of legitimate concern to the prosecutors." [16] The fact that the prosecution took into consideration the race of Ms. Reed prior to exercising the peremptory did not, under these circumstances, make the challenge illegitimate under *Batson*. The peremptory was not exercised upon Ms. Reed solely because she was black or because the prosecution was afraid that she would be biased toward the defendant because they were of the same race. Rather, we find that the justification given by the prosecution for striking Ms. Reed was within the *Batson* mandate as legitimate, "clear and reasonably specific," and "related to the particular case to be tried." *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20.

Furthermore, the cases relied upon by the appellant to support his belief that the justifications given were forbidden under *Batson* are clearly distinguishable from the facts of this case. In *United States v. Thompson,* 827 F.2d 1254, 1260 (9th Cir.1987), the prosecution challenged a juror because "he lived in the [defendant's] neighborhood—he's black, too, and he was dressed casually, and I thought he might identify with [the defendant] too much." We agree with the finding of the Ninth Circuit that the fact that a juror might identify with the defendant is exactly what *Batson* is intended to prohibit. However, the prosecution in the *Holder* case did not

**16.** Judge Leinenweber's Memorandum Opinion and Order dated April 12, 1994 at page 5.

express the similar concern that Ms. Reed would identify with Mr. Holder.

Appellant also relies upon *Williams v. Chrans*, 957 F.2d 487 (7th Cir.1992), where the reason offered for striking one of the black venirepersons was because she worked in an area primarily dominated by members of the defendant's street gang, and would likely have contact with those similar to the defendant. Not only is this case factually distinguishable, as Ms. Reed was not excluded because she lived or worked in the same neighborhood as the defendant, but the justification offered in *Williams* was found by this court to be acceptable under *Batson. Id.* at 489–490.

■ According to the *Batson* framework, since we have found that the prosecution set forth a legitimate justification for the exclusion of Ms. Reed, the burden now shifts to the defendant to prove the existence of purposeful discrimination. Appellant asserts, as the magistrate found, that the prosecutors' election to strike Ms. Reed but not Juror Ellman reveals sufficient evidence of the prosecutors' discriminatory intent. However, after conducting our own comparison of Juror Ellman and Ms. Reed, we conclude that the record does not support the inference of discriminatory intent on the part of the prosecutors. The prosecutors' primary reason for striking Ms. Reed was the concern that she would harbor feelings of selective prosecution against the Will County State's Attorney's Office. Juror Ellman's experiences with the office did not warrant the same concern from the prosecutors. Similarly, the "brushes with the law" of Juror Reimer, Juror Pelton, and Juror Meadows are minor in comparison with Ms. Reed's experience of having the Will County office drop the charges against the murderer of her brother just two years prior to the *Holder* trial. Because of these significant differences, we find that the defendant has failed to uncover any convincing evidence that the prosecutors purposefully discriminated against Ms. Reed on the basis of her race. Accordingly, we affirm the district court's denial of Holder's petition for *habeas corpus* relief brought pursuant to 28 U.S.C. § 2254.

AFFIRM.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I believe that under *Batson,* the difficulties are more serious and the analysis more complex than indicated by the majority. In light of the clear existence of one impermissible motive behind the prosecution's strike of Ms. Reed, I believe that remand is warranted to determine whether Reed would have been empaneled in the absence of this motive.

It is appropriate to think about the prosecution's reasons for striking Reed as involving two separate motivations, though they may have been articulated as one. First, the prosecutors were concerned because Reed was closely related to the victim of an unprosecuted crime (suggesting that she might be biased toward the prosecutor's office). One of the prosecutors, Ms. Patton, in fact stated that this was her only reason for excluding Reed. This is rather clearly a legitimate race-neutral reason of the type that insulates a prosecutor's action from challenge.

Second, however, race motivated the prosecutors. Mr. Miller stated that race was a concern "as it related to her brother being shot and killed in Will County, the charges being dropped, and then the victim in the instant case being white and the defendant being black." They were thus concerned that *because Ms. Reed was African–American* she might harbor animosity toward a prosecutor's office that prosecuted a crime against a Caucasian victim (in fact asking for the death penalty), yet had failed to prosecute that same crime when the victim was African–American. This is precisely what *Batson* prohibits—the striking of a juror because of a presumed racial identification with the defendant. 476 U.S. at 97, 106 S.Ct. at 1723 (impermissible to engage in assumption that jurors "would be partial to the defendant because of their shared race"). While the prosecutors did not necessarily assume Reed would be partial to the defendant simply because she shared his race, they did believe that race might be a motive in her decision-making-namely, they worried that she would be influenced by racial sympathy insofar as a crime against an African–Ameri-

can went unprosecuted, but a crime against a Caucasian did not. A strike based on an assumption that African–American jurors would be so concerned in capital cases involving a Caucasian victim and an African–American defendant would clearly violate the Equal Protection Clause. *See United States v. Brown*, 817 F.2d 674, 676 (10th Cir.1987) (striking African–American jurors because of assumption that they knew and respected well-known African–American defense counsel violated *Batson*).

The majority's analysis, which lumps the two factors motivating the prosecutors together, should not thus succeed in insulating the strike of Reed from challenge. The prosecutors' stated reasons for striking Ms. Reed must be understood as two separate reasons. The fact of Reed's relation to the victim of an unprosecuted crime has nothing to do with her race. But when her race *is* considered under selective prosecution, that consideration suggests that the prosecutors believed that any antagonism she might have harbored toward the prosecutor's office could have been enhanced or aggravated. The concerns enunciated by the prosecution are separate.

The question, therefore, is whether the existence of a criterion specific only to Reed (her relationship to a victim of an unprosecuted crime) is sufficient to overcome an impermissible motive (the assumption that because Reed was African–American she would be concerned about selective prosecution).[1] Here, Holder can cogently argue that *both* reasons prompted the strike of Ms. Reed. That is, Holder can argue that, in the absence of either motive, Reed would not have been struck; the prosecutors did not strike Caucasian jurors who had similar "brushes" with the law. This factor at least raises the inference that concerns about selective prosecution weighed more heavily in prosecutors' minds than they were willing to admit. Viewing the issue in this light places us squarely in the context of mixed motive analysis. Other courts confronted with similar mixed motive situations have ordered remand to determine whether the same action would have been taken in absence of the impermissible motive.

The Second Circuit announced the remand rule in *Howard v. Senkowski*, 986 F.2d 24 (2d Cir.1993). There, the prosecutor admitted to having impermissible motivations (namely, to assuming that African–American jurors would be more sympathetic to African–American defendants), but claimed that the jurors would have been struck anyway. The Second Circuit held that "[o]nce the claimant has proven improper motivation, dual motivation analysis is available to the person accused of discrimination to avoid liability by showing that the same action would have been taken in the absence of the improper motivation that the claimant has proven." 986 F.2d at 27. The court therefore remanded for the purpose of making this determination. I believe that we must proceed by mixed motive analysis here.

It is no answer, contrary to the majority's opinion, to suggest that *Batson* only prohibits strikes occurring "solely" on the basis of race. The Second Circuit rather resoundingly rejected the logic of this argument in *Howard*, 986 F.2d at 28–29. The Second Circuit refused to attach significance to *Batson*'s use of the adverb "solely," and proceeded by the more standard equal protection analysis—namely, when two motives seemed to have influenced the decision-maker, that party has the right to prove that the same decision would have been made even in the absence of the impermissible motive.

Under this mixed motive analysis, Holder has a strong argument that remand is appropriate insofar as it would enable the district court to consider the issue precisely in light of the standard that I have discussed. Although the district court has already grappled to a degree with this problem (it found that the Caucasian jurors' "brushes" with the law were much less significant than that of Reed), precise findings would be more help-

---

1. An argument has been made that the mere existence of one impermissible reason tainted the decision-making process and violated *Batson*. *See Wilkerson v. Texas*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989) (denying petition for certiorari) (Marshall, J., dissenting; joined by Brennan, J.) (suggesting that mixed motive analysis is inappropriate in the framework of peremptories).

ful. It is not necessarily clear that an invidious motive prompted the strike of Reed. Other African–American jurors do not appear to have been struck because of concerns about selective prosecution. And only one of the prosecutors articulated the impermissible reason for striking Reed. These factors, taken together, strengthen the prosecution's case. Yet neither is it clear that the prosecution would have refused to empanel Reed in the absence of concerns about selective prosecution. Reed did state that her ability to be fair to the prosecution was not impaired by the incident involving her brother. For these reasons, remand is desirable.

I therefore respectfully dissent to the extent indicated.